*63 Johnson, J.
(dissenting.) — In this case, I have the misfortune to dissent from the majority of my brethren. As it is a case of much interest, I feel it incumbent upon me, to assign the reasons upon which I adopt the opinion that this court has not authority to issue the writ of habeas corpus now moved for. The prisoners are in confinement under a commitment ordered by the superior *court of the District of Columbia, upon a charge of high treason. This motion has for its object their discharge or ad- *- mission to bail, under an order of this court, as circumstances, upon investigation, shall appear to require. The attorney-general having submitted the case without opposition, I will briefly notice' such objections as occur to my mind against the arguments urged by the counsel for the prisoners.
Two questions were presented, to the consideration of the court. 1st Does this court possess the power, generally, of issuing the writ of habeas corpus f 2d. Does it retain that power in this case, after the commitment by the circuit court of Columbia ?
In support of the affirmative of the first of these questions, two grounds were assumed. 1st. That the power to issue this writ was necessarily in cident to this court as the supreme tribunal of the Union. 2d. That it is given by statute, and the right to it has been recognised by precedent.
On the first of these questions, it is not necessary to ponder long ; this court has uniformly maintained that it possesses no other jurisdiction or power than what is given it by the constitution and laws of the United States, or is necessarily incident to the exercise of those expressly given.
Our decision, must, then, rest wholly on the due construction of the constitution a,nd laws of the Union, and the effect of precedent, a subject which certainly presents much scope for close legal inquiry, but very little for the play of a chastened imagination.
The first section of the third article of the constitution vests the judicial power of the United States in one supreme court, and in such inferior courts as the congress *may from time to time establish. The second sec- [*103 tion declares the extent of that power, and distinguishes its juris- *- diction into original and appellate. The original jurisdiction of this court is restricted to cases affecting ambassadors or other public ministers, and consuls, and those in which a state shall be a party. In all other cases within the judicial powers of the Union, it can exercise only an appellate jurisdiction. The former it possesses independently of the will of any other constituent branch of the general government. Without a violation of the constitution, that division of our jurisdiction can neither be restricted or extended. In the latter, its powers are subjected to the will of the legislature of the Union, and it can exercise appellate jurisdiction in no case, unless expressly authorized to do so by the laws of congress. If I understand the case of Marbury v. Madison, it maintains this doctrine in its full extent. I cannot see how it could ever have been controverted.
It is incumbent, then, I presume, on the counsel, in order to maintain their motion, to prove that the issuing of this writ is an act within the power of this court, in its original jurisdiction, or that, in its appellate capacity, the power is expressly given by the laws of congress. This it is attempted to do, by the 14th and 33d sections of the judiciary act, and the cases of Hamilton and Burford, which occurred in this court, the former in *64 1795, the latter in 1806. How far their position is supported by that act and those cases, will now be the subject of my inquiry.
With a very unnecessary display of energy and pathos, this court has been imperatively called upon to extend to the prisoners the benefit of precedent. I am far, very far, from denying the general authority of adjudications : uniformity in decisions is often as important as their abstract justice : but I deny, that a court is precluded from the right, or exempted from the necessity, of examining into the correctness or consistency of its *104] own *decisions, or those of any other tribunal. If I need precedent to support me in this doctrine, I will cite the example of this court, which, in the case of United States v. More (3 Cr. 159), acknowledged that in the case of United States v. Simms (1 Ibid. 252), it had exercised a jurisdiction it did not possess. Strange indeed would be the doctrine, that an inadvertency once committed by a court shall ever after impose on it the necessity of persisting in its error. A case that cannot be tested by principle, is not law, and in a thousand instances, have such cases been declared so by courts of justice.
The claim of the prisoners, as founded on precedent, stands thus. The case of Hamilton was strikingly similar to the present. The prisoner had been committed by order of the district judge, on a charge of high treason. A writ of habeas corpus was issued by the supreme court, and the prisoner bailed by their order. The case of Burford was also strictly parallel to the present; but the writ in the latter case having been issued expressly on the authority of the former, it is presumed, that it gives no additional force to the claim of the prisoners, but must rest on the strength of the case upon which the court acted. It appears to my mind, that the case of Hamilton bears upon the face of it evidence of its being entitled to little consideration, and that the authority of it was annihilated by the very able decision in Marbury v. Madison. In this case, it was decided, that congress could not vest in the supreme court any original powers beyond those to which this court is restricted by the constitution. That an act of congress vesting in this court the power to issue a writ of mandamus, in a case not within their original jurisdiction, and in which they were not called upon to exercise an appellate jurisdiction, was unconstitutional, and void. In the case of Hamilton, the court does not assign the reasons on which it founds its decision, but it is fair to presume, that they adopted the idea which appears to have been admitted by the district-attorney in his argument, to wit, that this court possessed a concurrent power with the district court in admitting to bail. Now, a concurrent power in such a case must be an *105] original *power, and the principle in Ma/rbury v. Madison applies as much to the issuing of a habeas corpus in a case of treason, as to the issuing of a mandamus in a case not more remote from the original iurisdiction of this court. Having thus disembarrassed the question from the effect of precedent, I proceed to consider the construction of the two sections of the judiciary act above referred to.
It is necessary to premise, that the case of treason is one in which this court possesses neither original nor appellate jurisdiction. The 14th section of the judiciary act, so far as it has relation to this case, is in these words : “ All the before-mentioned courts (of which this is one) of the United States shall have power to issue writs of scire facias, habeas corpus, and all other *65 writs- not specially provided for by statute, which may be necessary for the exercise of tbeir respective jurisdictions, and agreeable to the principles and usages of law.” I do not think it material to the opinion I entertain, what construction is given to tbis sentence. If the power to issue the writs of scire facias and habeas corpus be not restricted to the cases within tbe original or appellate jurisdiction of this court, tbe case of Marbury v. Madison rejects tbe clause as unavailing ; and if it relate only to cases within their jurisdiction, it does not extend to tbe case which is now moved for. But it is impossible to give a sensible construction to that clause, without taking tbe whole together ; it consists of but one sentence, intimately connected throughout, and has for its object, tbe creation of those powers wbicb probably would have vested in tbe respective courts, without statutory provision, as incident to tbe exercise of theii- jurisdiction. To give to tbis clause the construction contended for by counsel, would be, to suppose that tbe legislature would commit tbe absurd act of granting tbe power- of issuing tbe writs of scire facias and habeas corpus, without an object or end to be answered by them. Tbis idea is not a little supported by tbe next succeeding clause, in which a power is vested in tbe individual judges to issue tbe writ of habeas corpus, expressly for tbe purpose of inquiring into the cause of commitment. That part of tbe 33d section of tbe judiciary act which relates to tbis subject is in tbe following words: “ And *upon all [*106 arrests in criminal cases, bail shall be admitted, except where tbe * punishment is death, in wbicb cases it shall not be admitted, but by tbe supreme or a circuit court, or by a justice of tbe supreme court, or a judge of a district court, who shall exercise tbeir discretion therein, regarding the nature and circumstances of tbe offence, and of the evidence and usage of law.”
On considering this act, it cannot be denied, that if it vests any power at all, it is an original power. “ It is the essential criterion of appellate jurisdiction, that it revises and corrects the proceedings in a cause already instituted.” I quote tbe words of tbe court in tbe case of Marbury v. Madison.. And so far is this clause from giving a power to revise and correct, that it actually vests in tbe district judge tbe same latitude of discretion, by the-same words, that it communicates to tbis court. And without derogating; from a respectability wbicb I must feel as deep an interest in maintaining as-any member of tbis court, I must believe, that tbe district court, or any individual district judge, possesses the same power to revise our decision, that, we do to revise theirs ; nay, more, for tbe powers with wbicb they may be-vested are not so particularly limited and divided by tbe constitution, as ours are. Should we perform an act wbicb, according to our own principle, we cannot be vested with power to perform, what obligation would any otber court or judge be under to respect that act ?
There is one mode of construing tbis clause, wbicb appears to me to remove all ambiguity, and to render every part of it sensible and operative. By tbe consent of bis sovereign, a foreign minister may be subjected to tbe laws of the state near wbicb be resides. Tbis court may then be called upon to exercise an original criminal jurisdiction. If tbe power of tbis court to bail be confined to that one case, reddendo singula singulis, if the power of tbe several courts and individual judges be referred to tbeir respective jurisdictions, all clashing and interference of power ceases, and sufficient means *66 of redress are still held out to the citizen, if deprived of his liberty; and this surely must have been the intention of the legislature. It never coulu have *, been contemplated, that the mandates of this court *should be borne J to the extremities of the states, to convene before them every prisoner who may be committed under the authority of the general government. Let it be remembered, that I am not disputing the power of the individual judges who compose this court, to issue the writ of habeas corpus. This application is not made to us, as at chambers, but to us, as holding the supreme court of the United States, a creature of the constitution, and possessing no greater capacity to receive jurisdiction or power than the constitution gives it. We may, in our individual capacities, or in our circuit courts, be susceptible of powers merely ministerial, and not inconsistent with our judicial characters, for on that point the constitution has left much to construction ; and on such an application, the only doubt that could be entertained would be, whether we can exercise any power beyond the limits of our respective circuits. On this question, I will not now give an opinion.
One more observation, and I dismiss the subject. In the case of Burford, I was one of the members who constituted the court. I owe it to my own consistency, to declare that the court were then apprised of my objections to the issuing of the writ of habeas corpus. I did not then comment at large on the reasons which influenced my opinion, and the cause was this : the gentleman who argued that cause confined himself strictly to those considerations which ought alone to influence the decisions of this court. No popular observations on the necessity of protecting the citizen from executive oppression, no animated address calculated to enlist the passions or prejudices of an audience in defence of his motion, imposed on me the necessity of vindicating my opinion. I submitted, in silent deference to the decision of my brethren. In this ease, I feel myself much relieved from the painful sensation resulting from the necessity of dissenting from the majority of the court, in being supported by the opinion of one of my brethren, who is prevented by indisposition from attending.
*February 16th, 1807. The marshal of the district of Columbia having returned upon the habeas corpus, that he detained the prisoners by virtue of the before-recited order of the circuit court of that district—
G. Lee now moved, that they should be discharged ; or, at least, admitted to bail; and contended, 1. That from the record of the circuit court, and upon the face of the proceedings, the imprisonment was illegal and oppressive ; and 2. That if the commitment was not illegal upon its face, yet, as the order of the court refers to the testimony on which it was founded, it will appear to be illegal, upon the whole proceedings.
The commitment is not for trial at any particular time, before any particular court, nor in any particular place. By the Sd article of the constitution of the United States, the trial of crimes shall be in the state where they shall have been committed ; but when not committed in any state, the trial shall be at such place or places as congress may by law have directed. So, by the 29th section of the judiciary act of 1789 (1 U. S. Stat. 88), in all cases punishable with death, the trial shall be had in the county where the offence was committed, or where that cannot be done, without great inconvenience, twelve petit jurors, at least, shall be summoned from thence ; and by the *67 33d section of the same act (Ibid. 91), offenders are to be arrested and imprisoned or bailed for trial, before such court of the United States, as by that act has cognisance of the offence ; and copies of the process shall be returned, as speedily as may be, into the clerk’s office of such court, together with the recognisances of the witnesses for their appearance to testifyin the case, and if the commitment be in a district other than that in which the offence is to be tried, it shall be the duty of the judge of the district where the delinquent is imprisoned, to issue a warrant for the removal of the offender to the district in which the trial is to be had.
*These are provisions for a speedy and fair trial, in obedience to the constitution ; for it has always been considered as necessary to a fair trial, that it should be where the witnesses may easily attend, and where the party is known. The 6th amendment to the constitution provides, that the accused “ shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district, wherein the crime shall have been committed, which district shall have been previously astertained by law.” By the act for the punishment of certain crimes, § 8 (1 U. S. Stat. 113), it is enacted, that “ the trial of crimes committed ” “ in any place out of the jurisdiction of any particular state, shall be in the district where the offender is apprehended, or into which he may first be brought.”
By the English habeas corpus act, whose provisions are considered as extending to cases even out of the act, the prisoner may petition the court for trial, at the first term, and if not then tried, he is entitled to bail, of course. If the commitment is in a district in which he cannot be tried, he will not be entitled to this privilege, for he is still to be removed to the place of trial. Hence, it is necessary that the commitment should state the court before whom the trial is to be had. It is also neeessaxy, in order that the district judge may know where to send him. No pei’son but the district judge has authority to send him to the place of trial, and if the commitment be not made by the district judge, it is impossible, that he should judicially know where to send him, unless the place of trial be mentioned in the warrant of commitment. It is also necessary, that the accused may know where to collect his witnesses together.
The order of commitment ought also to have stated more particularly the overt act of treason. It is too vague and uncertain.
2. The testimony before the circuit court did not show probable cause. *By the 4th amendment to the constitution, it is declared, “ that the right of the people to be secure in their persons, houses, papei's and *- effects, against unreasonable searches and seizures, shall not be violated; and no warrants shall issue, but upon probable cause, supported by oath or affirmation.” All the facts necessary to constitute this probable cause must appear upon oath or affirmation. It is not necessary, indeed, that there should be positive proof of every fact constituting the offence ; but nothing can be taken into the estimate, when forming an opinion of the probability that the fact was committed by the person charged, but facts supported by oath or affirmation. No belief of a fact, tending to show probable cause, no hearsay, no opinion of any person, however high in office, respecting the guilt of the person accused, can be received in evidence on this examination.
The question, then, is, whether these affidavits exhibit legal proof of probable cause. If the testimony be vague or ambiguous, as to the person, *68 or as to the offence, the court will apply the maxim of law, that every person is to be adjudged innocent, unless proved to be guilty. The facts stated in General Wilkinson’s two affidavits of the 14th and 26th of December, consist of the letters of Col. Burr, the declarations of Swartwout, and the belief of General Wilkinson. Neither the letters of Col. Burr, nor the declarations of Swartwout, contain any ground for probable cause to believe that the prisoners, or either of them, is guilty of treason; and General Wilkinson’s belief, as he himself states, is founded upon those facts.
Mr. Lee went into a minute examination of those affidavits, to satisfy the court that the facts stated in them could, at most, prove an intent to set on foot an expedition against Mexico, in case of a war between this country and Spain. He contended, that if the object was such an expedition, at all events, *1111 and if they had intended *to force their way through the United -* States, for the purpose of attacking Mexico, and even if they had done so, they would not have been guilty of treason, but merely of lawless violence. Even if they had plundered the bank at New Orleans, or any private property, or had seized arms and vessels, the property of individuals, it would have been robbery, but not treason.
But the circumstance that no place of trial can be designated, is a sufficient reason for admitting them to bail. They certainly cannot be tried here, for it is not contended, that they have here committed any offence ; and this is not the district in which they were first apprehended or brought. They were seized, by order of a military officer, 2000 miles from this place, without any process of law or legal authority, and sent here to be disposed of by the executive. They have been committed for trial, not before any court, or in any particular district, and their imprisonment will be perpetual, unless government can find out when and where the offence was committed, and devise some means of transmitting them to the place of trial.
Mr. Lee attempted to discredit the affidavits of General Wilkinson, by the circumstance that they were made, as he contended, to vindicate and justify the illegal seizure and transportation of the prisoners. He contended also, that these affidavits ought to be totally discarded, because the oath upon which a warrant of arrest or commitment is to be grounded, must be made before the magistrate who is about to issue the warrant. He must be satisfied of the probable cause. The laws were open in New Orleans. General Wilkinson might have gone before a justice of peace there, and made his oath, and obtained a warrant to arrest the prisoners. There was no necessity to proceed in this illegal and unprecedented manner.
JBI 3. Key, on the same side. — Unless this court can look behind the order for commitment, and examine the grounds upon which it was made, the writ of habeas corpus will be wholly useless ; for every court or magistrate who * - commits a person to *prison, will take care to cover himself under the ■J strict forms of law.
The constitution declares that treason against the United States shall consist only in levying war against them, or in adhering to their enemies,, giving them aid and comfort. An adherence to rebels is not an adherence to an enemy, within the meaning of the constitution. Hence, if the prisoners are guilty, it must be of levying war against the United States.
*69 In England, the books speak of two kinds of levying of war — direct and constructive. (East’s Cr. Law 67.) But there is only one kind in this country ; and ought not to be, in England. By using the word “ only,” the constitution meant to take away all pretence of constructive treason. Every man is to answer for his own acts only. If 100 men conspire, and only 50 actually levy war, the latter only are guilty as principals.
And what reason can be given, why there should not be the same distinction between principal and accessory in treason, as in other crimes. In a republican government, whose basis is the affection of the people, it is unnecessary to guard against offences of this kind, with the same vigilance as in a monarchy or a despotism whose foundation is fear. (4 Tucker’s Bl., Appendix, p. 39.) But if this construction of the constitution be not correct, and if the English authorities are to be considered in full force, it must be shown, 1st. That war has been levied ; and 2d. That the prisoners are confederates in that war.
The affidavits of General Wilkinson are not authenticated, so as to make them evidence. It does not appear, that an oath was administered to him. The act to prescribe the mode of authenticating public acts, records and judicial proceedings, &c., is extended to the territory *of Orleans, by r*113 the act erecting that territory. (2 U. S. Stat. 285.) And even if *- this be not strictly a judicial proceeding, yet it is within the meaning of that act. The certificate of the secretary of state (a) only shows that it appears by the official returns to his office, that J. Carrick and George Pollock had been appointed justices of the peace for the county of Orleans ; but not that they had taken the oaths necessary to qualify them to act.
But if these affidavits are examinable, they do not show any act of treason. They prove no assemblage of men, nor military array. There is not a tittle of evidence, that any two men have been seen together with treasonable intent, whether armed or not. The supposed letter from Col. Burr speaks indeed of choice spirits, but he does not tell us they are invisible spirits. The affidavits of Meade and Wilson relate only to rumors derived from General Wilkinson, whose business it was, if he could get such rumors there, by no other means, to create them himself. The territory of Orleans, if it was to be revolutionized, might be revolutionized, without levying war against the United States. There is no evidence, that the prisoners .knew that Col. Buirr had any treasonable projects in view. Even if he had such views, he might have held out to them, as he did to others, only the Spanish expedition.
Again, the bench-warrant issued in this case for the arrest of the prisoners was illegal. The court has no authority to issue a bench-warrant, but upon a presentment by a grand .jury, or for an offence committed in *the presence of the court. It is not a power inherent in the court, r*.... . nor given by any law. The act of congress only gives to a judge out L of court, or to a justice of peace, the power of arresting offenders. And it is a power inconsistent with a fair trial, because the court would thereby have *70 prejudged the ease, and decided upon the guilt of the prisoner. No such practice is known in Maryland, under whose laws the court below was acting.
February 17th, 1807. Jones, attorney for the district of Columbia, mentioned to the court, that JZiort, being better prepared upon points of practice, would make some observations in support of the form of the commitment.
Maeshaíl, Oh. J. — I understand the clear opinion of the court to be (if I mistake it, my brethren will correct me), that it is unimportant whether the commitment be regular in point of form, or not; for this court, having gone into an examination of the evidence upon which the commitment was grounded, will proceed to do that which the court below ought to have done.
Rodney, Attorney-General. — The affidavit of General Wilkinson is sufficiently authenticated. The justices of peace in the territory of Orleans, are officers of the United States ; they are appointed by the governor of the territory, who is appointed by the President of the United States ; and the secretary of the territory is bound by law to transmit copies of all the executive proceedings of the governor of the territory every six months to the President of the United States. (2 U. S. Stat. 283.) All the officers of the United States are bound to take notice of each other. The act of congress respecting authentication of records, &e., is cumulative only. It does not repeal any former law.
There is some weight in the objection, that the oath ought to be made i before the magistrate who issues the *warrant. But one magistrate ' is as competent as another to administer the oath. The constitution is silent on the subject; and if it be taken before a person competent to administer it, it satisfies the provision of the constitution. How else could a criminal be arrested in one part of the United States, when the witness lived in another ?
It is true, that none of the evidence now offered would be competent on the trial; nor even if it appeared in a proper shape, would it be sufficient to convict the prisoners. But the question is, whether, in this incipient stage of the prosecution, it is not sufficient to show probable cause ?
The expedition against Mexico would not be treason, unless it was to be accomplished by means which in themselves would amount to treason. But if the constituted authorities of the United States should be suppressed but for one hour, and the territory of Orleans revolutionized but for a moment, it would be treason. What would be treason by adhering to an enemy, if done towards a rebel, will be a levying of war. (3 Wilson’s Lectures 105 ; 4 Bl. Com. 92.) In treason, all are principals. There are no accessories. It has been argued (and the respectable authority of Judge Tucker is cited), that none are principals but those present at the treasonable act. The argument may have some weight, but it is a point at least doubtful, and therefore, ought to be left to be decided on the trial.
It is true, that we cannot, at present, say exactly when and where the overt act of levying war was committed, but from the affidavits, we think it fair to infer, that an army has been actually levied and arrayed. The declaration of one of the prisoners was, that Colonel Burr “ was levying an armed body of 7000 men.” How the fact has turned out to be since, we do not *71 know; and it is also true, that we do not know that any men have been seen collected in military array. But Dr. Bollman informed General Wilkinson, that he had seen a letter from Colonel Burr, in which he says, that he should be at Natchez *with 2000 men, on the 20th of December, p., „ and that he would be followed by 4000 more, and that he could have L raised 12,000 as easily as 6000, but he did not think that number necessary. If Colonel Burr was actually levying an armed body of men ; if he expected to be at Natchez, on the 20th of December, with 2000, and calculated upon being followed by 4000 more, and if he found it so easy to raise troops, is there not a moral certainty, that some troops, at least, have been raised and embodied ? It may be admitted, that General Wilkinson was interested to make the worst of the story, but the declarations of the prisoners themselves are sufficient.
Jones, attorney for the district of Columbia, on behalf of the prosecution. — As to the objection, that the commitment must be for trial in some court having jurisdiction over the offence. It was uncertain, whether any, and if any, what place was prescribed for the trial of this offence. But any court of the United States had jurisdiction to commit for trial, by the act of congress for the punishment of certain crimes, &c.. (1 U. S. Stat. 113, § 8.) “ The trial of crimes committed on the high seas, or in any place out of the jurisdiction of any particular state, shall be in the district where the offender is apprehended, or into which he may be first brought.” Although the first part of the section speaks of certain crimes committed “ upon the high seas, or in any river, haven, basin or bay, out of the jurisdiction of any particular state,” yet the last clause of the section is general, and in its terms applies to the trial of all crimes committed out of the jurisdiction of any particular state. This act of congress is the only exercise of the provision of the 3d article of the constitution, respecting crimes committed not within any state. Unless this act of congress fixes the place of trial, there is no place prescribed, either by the law or the constitution, and the trial may as well be in the district of Columbia, as elsewhere. But if this act of congress does fix the place, then it is objected, *that this district is neither that in p.. which the prisoners were apprehended, nor that into which they were L first brought.
The answer is, that the act of congress means the district in which they shall be legally apprehended, that is, arrested by process of law. It could not mean a mere military seizure. But whether the court below had or had not jurisdiction to try the prisoners, it clearly had jurisdiction to commit them; and if their commitment be irregular, this court will say how they ought to be committed. (1 U. S. Stat. 91, § 33.)
It is objected, that although the judges and justices have power to arrest, yet the courts have not, and therefore, cannot issue a bench-warrant but upon the presentment of a grand jury, or for an offence committed in the presence of the court. And the practice of Maryland is cited. But it is stated, that at Montgomery court, in Maryland, very lately, a venerable and ancient judge of that court did issue a bench-warrant for an offence not presented by the grand jury, nor committed in presence of the court, (a)
*72 It is not necessary, that the commitment should state the place of trial, nor that they are committed for trial.' If, at the time of commitment, it be uncertain where they ought to be tried, they may be committed, generally, until discharged by due course of law. In England, it is only necessary that the commitment should be to some jail in England. 2 Hawk. P. C. 120, b. 2, c. 16, § 18.
As to the authentication of the affidavits of General Wilkinson, it being shown that Pollock and Carrick were duly appointed justices of the peace, and having Undertaken to act as such, it is to be presumed, that they have taken the necessary oaths.
It is admitted, that the constitution has prevented many questions as to the doctrine of treason. The intention of having a constitutional definition of the crime, was to put it out of the power of congress to invent treasons. But it was impossible to define what should, in every case, be deemed a levying of war. It is a question of fact, to be decided by the jury, from all the circumstances. Warlike array is not necessary. It is only a circumstance. 1 East’s Cr. Law 66. According to the English books, a direct levying of war, is a war directly against the person of the king. A constructive levying of war, is war against the government. If men have been levied, and arms provided, with a treasonable intent, this is a sufficient levying of war, without warlike array.
The affidavit of General Eaton establishes the treasonable intent in Col. Burr. The question, then, is, whether that intent, or a knowledge of that intent, can be brought home to the prisoners. Mr. Jones here went into an argument, to show the connection of the prisoners with Col. Burr, and their knowledge of his projects. He observed, that his argument, on a former occasion, respecting the president’s message to congress, had been misunderstood. A state of war is a matter of public notoriety, and he had considered the president’s message as evidence of that notoriety, it being a communication from the supreme executive, in the course of his duty, to that •department of government which alone could decide on the state of war.
He contended, that no specific number, no sufficiency of force to accomplish the object, was necessary to constitute treason. If soldiers are levied and officered, with a treasonable intent, and equipments prepared, so that 5*, i .i they can readily lay hold of their arms; although no men are *actu-1 ally armed; although only five men in a detachment should march to assemble at a place of rendezvous, and although there should be no warlike array, yet it would be treason. Anything which amounts to setting on foot a military expedition, with intent to levy war against the United States, is treason.
The distinction between those who are present at the overt act of levying war, and those who are confederated, adhering, acting and assisting, giving aid and comfort, is contrary to all analogy. In treason, all are principals. In murder, if two conspire, and one is acting and assisting at such a distance as to give aid, he is equally guilty with him who gave the wound.
*73 It has been insinuated, that General Wilkinson is to be considered as partieeps criminis. If that were the case, it would be no disqualification of his testimony.
Treason is a greater crime in republics than in monarchies, and ought to be more severely punished.
Harper, in reply, congratulated his country on the triumph of correct principles, in the abandonment, on the part of the prosecution, of the dangerous doctrine, that executive messages were to be received as evidence in a criminal prosecution.
Jones. — The sole purpose for which we introduced the president’s message, was, to show that the assemblage of a military force by Col. Burr, was a matter of notoriety. We did not attempt or wish to introduce it as direct evidence.
Harper. — To use an executive message in a court of justice, for any purpose of proof whatever, so as to aid in the commitment of a citizen under a criminal accusation ; to introduce it as evidence of any fact (of notoriety, for instance, which is a fact) ; is to give it the effect of testimony, and is a direct violation of the constitution.
*We object to the translation of the ciphered letter contained p. „„ in General Wilkinson’s affidavits, being admitted as evidence, because *- General Wilkinson has not sworn that it is a true translation, nor sent the original, with the key, so that the court can have a correct translation made. Nor is it proved, that the original was written by Col. Burr, or by his direction, nor that the prisoners were acquainted with its contents.
Another objection to the affidavits is, that they were not made for the purpose of procuring an arrest. They were not made before the judicial officer on whose warrant the proceedings of the court were to be founded ; and who would have been bound to cross-examine the witness, to sift the facts, and to judge how far they were proved, and how far they were sufficient to justify the proceedings. But, after a military arrest, the affidavits are drawn up by the author of the arrest, without cross-examination or inquiry, and were sworn to by him, as the justification of his conduct. The persons whom he has thus arrested are sent to a distant part of the country, and these affidavits are sent after them, to operate as the ground of their commitment and detention. No person can lawfully be committed on testimony so taken. In cases of arrests and commitments, the general rules of evidence are no further to be departed from, than the necessity of the case requires. On application to a magistrate for a warrant of arrest, the evidence must necessarily be ex parte, but no other departure from the common rules of evidence is justifiable, because not necessary. It is a general rule of law respecting testimony, that it shall be taken before the tribunal which is to act upon it, or under the direction of that tribunal; that the person who is to decide, shall also inquire ; that the inquiry shall not be before one tribunal, and the judgment pronounced by another. This rule, so important to the safety of persons accused, is equally applicable to arrests and commitments as to trials, and should, therefore, be equally observed. The party arrested and brought before the magistrate for commitment, has a right to be confronted with his accuser, and to cross-examine *74 the witnesses produced against him, and hy that means, to explain circumstances which, at first view, might criminate him. But if the practice *121] which is attempted in this case be sanctioned by this court; if a mili- -* tary officer, or any other person, is to be permitted to seize a man, and send him 2000 miles from the place of arrest, and from the place of the alleged transaction, and to send after him an ex parte affidavit as the ground of his subsequent commitment, the great security provided by law for the protection of innocence and liberty is broken down.
Mr. Harper then went into a minute examination of the contents of the affidavits, and contended that, if they could be considered by this court as evidence, they did not prove that treason had been committed, nor that the prisoners had participated in any crime or offence whatever.
February 18th, 1807. Martin, on the same side. — The order for the commitment was erroneous, in directing the prisoners to be committed to the prison of the court. It ought to have been to the marshal. Bethel's Case, 1 Salk. 348 ; s. c. 5 Mod. 19.
This court cannot remand them, or commit them, upon this habeas corpus, for any crime but that for which they were committed in the court below ; and can only commit them for trial before some court. The only power given by the 33d section of the judiciary act, is to cause offenders to “be arrested; and imprisoned or bailed, as the case may be, for trial before such court of the United States, as by this act has cognisance of the offence.” The place of trial is to be decided by the place where the of-fence was committed.
The act of congress for the punishment of certain crimes, § 8, (1 U. S. Stat. 113) does not apply to crimes committed in any territory of the United States, in which there are courts of the United States having cognisance of the offence. It applies only to offences committed upon the “ high seas, or in any river, haven, basin or bay, out of the jurisdiction of any particular *122] state.” *The courts of the United States erected in the territory of Orleans are competent to try the offence of treason against the United States, committed within that territory. By the 8th section of the act of congress of 26th March 1804 (2 U. S. Stat. 285), erecting the territory of Orleans, a district court of the United States is established therein, having all the original powers and jurisdiction of a circuit court of the United States. And by the same act, the “ act for the punishment of certain crimes against the United States ” is extended to that territory.
It was, therefore, a wanton and unnecessary exertion of arbitrary power to send the prisoners here, where they cannot be tried. If there be any probability that a crime was committed by the prisoners, it is equally probable, that it was committed in the territory of Orleans. It is, at all events certain, that it was not committed here. The word apprehended, in the act of congress, cannot mean a legal arrest only. If it did, it would be in the power of a military commander to seize a man, and appoint the tribunal by which he shall be tried.
If it is the duty of this court, to commit the prisoners for trial, it is equally its duty to bind over the witnesses to appear at the time and place of trial, to testify in the case, and to return copies of the process, together with the recognisances of the witnesses, to the office of the clerk of the court *75 having cognisance of the offence. This shows that, upon every commitment, the witnesses must be in the presence of the tribunal committing. This court cannot commit, unless they first ascertain in what court the trial is to be had.
There is no legal evidence that General Wilkinson ever made oath to his statement. The certificate of the secretary is only that it appears by the return of the secretary of the territory of Orleans, that Pollock and Carrick were justices. A copy of that return ought to be certified.
^February 19th, 180/. The Court not having made up an opin- r*-> 2q ion, admitted the prisoners to bail until the next day. The Chief L Justice stated, that the court had difficulty upon two points, viz: 1. Whether the affidavit of General Wilkinson was evidence admissible in this stage of the prosecution; and 2. Whether, if admissible, his statement of the contents of the substance of a letter, when the original was in his possession, was such evidence as the court ought to notice. If the counsel had any authorities on these points, the court said they-would hear them.
February 20th, 180/. The Chief Justice asked, if the counsel had found any authorities on the points mentioned yesterday.
Rodney, Attorney-General, said, he had not; but he relied on general principles.
F. S. Key, cited The King v. The Inhabitants of Eriswell, 3 T. R. 707, where the principal question was, whether the ex parte examination of the pauper, taken before two justices, to whom no application was made for a removal of the pauper, was good evidence, before two other justices, five years afterwards, upon an application for his removal, the pauper having v: the meantime become insane. The judges of the court of king’s bench were equally divided. But Grose, J., said, “ nothing can be more unjust, than that a person should be bound by evidence which he is not permitted to hear.” “ The common law did not permit a person accused to be affected by an examination taken in his absence, because he could not cross-examine.” Buller, J., who was opposed to Grose, upon the principal question, admitted, “ that if the taking the examination were not a judicial act, but was merely coram non judice, it is *not evidence,” and that “ it must be r*.. „ . a judicial act, at the time it was taken, or cannot become so at all.” L Lord Kenton, Ch. J., said, the two justices who took the examination “ were not applied to for the purpose of making an order of removal; the overseers called upon them for no other purpose than to examine the pauper j all the proceedings, therefore, were extra-judicial; and the examination on oath might just as well have been taken before the parish clerk, and would have been as much entitled to credit as this.”
So, in this case, we say, that, as General Wilkinson did not apply to Justices Carrick and Pollock for a warrant to arrest Dr. Bollman and Mr. Swartwout, and as he did not make the affidavit for the purpose of obtaining from them such warrants, the whole proceedings before those justices were extra-judicial. The affidavits are not such as would support an indictment, if false. In the language of Lord Kenton, they deserve no more credit than if they had been made before the parish clerk. If the affidavit *76 be a judicial proceeding, it ought to be authenticated according to the act of congress. If it be not a judicial proceeding, it is not evidence.
Marshall, Ch. J. — If a person makes an affidavit before a magistrate, to obtain a warrant of arrest, such affidavit must necessarily be ex parte. But hów is it, on a motion to commit, after the person is taken ? Must not the commitment be upon testimony given in presence of the prisoner ?
Rodney, Attorney-General. — The first affidavit would be sufficient, unless disproved or explained by the prisoner on his examination.
Harper. — The necessity of the case is the only ground of an exception to the general rule of evidence ; and that necessity ceases when the party is taken.
*February 21st, 1807. Marshall, Ch. J., (a) delivered the opinion of the court. — The prisoners having been brought before this court on a writ of habeas corpus, and the testimony on which they were committed having been fully examined and attentively considered, the court is now to declare the law upon their case.
This being a mere inquiry, which, without deciding upon guilt, precedes the institution of a prosecution, the question to be determined is, whether the accused shall be discharged or held to trial; and if the latter, in what place they are to be tried, and whether they shall be confined or admitted ■to bail. “ If,” says a very learned and accurate commentator, “ upon this inquiry, it manifestly appears that no such crime has been committed, or ■that the suspicion entertained of the prisoner was wholly groundless, in such cases only, is it lawful totally to discharge him. Otherwise, he must either be committed to prison or give bail.”
The specific charge brought against the prisoners is treason, in levying war against the United States. As there is no crime which can more excite and agitate the passions of men than treason, no charge demands more from the tribunal before which it is made, a deliberate and temperate inquiry. Whether this inquiry be directed to the fact or to the law, none can be more solemn, none more important to the citizen or to the government; none can more affect the safety of both.
To prevent the possibility of those calamities which result from the ex-*1261 teilsion treason to offences of minor “Importance, that great fundaJ mental law which defines and limits the various departments of our government, has given a rule on the subject both to the legislature and the ■courts of America, which neither can be permitted to transcend. “ Treason against the United States shall consist only in levying war against them, or in adhering to their enemies, giving them aid and comfort.”
To constitute that specific crime for which the prisoners now before the court have been committed, war must be actually levied against the United *77 States. However flagitious may be the crime of conspiring to subvert by force the government of our country, such conspiracy is not treason. To conspire to levy war, and actually to levy war, are distinct offences. The first must be brought into open action, by the assemblage of men for a purpose treasonable in itself, or the fact of levying war cannot have been committed. So far has this principle been carried, that, in a case reported by Yentris, and mentioned in some modern treatises on criminal law, it has been determined, that the actual enlistment of men, to serve against the government, does not amount to levying war. It is true, that in that case, the soldiers enlisted were to serve without the realm, but they were enlisted within it, and if the enlistment for a treasonable purpose could amount- to levying war, then war had been actually levied.
It is not the intention of the court to say, that no individual can be 0uihy of this crime, who has not appeared in arms against his country. On the contrary, if war be actually levied, that is, if a body of men be actually assembled, for the purpose of effecting by force a treasonable purpose, all those who perform any part, however minute, or however remote from the scene of action, and who are actually leagued in the general conspiracy, are to be considered as traitors. But there must be an actual assembling ?< 1 men, for the treasonable purpose, to constitute a levying of war.
Crimes so atrocious as those which have for their object the subversion by violence of those laws and those institutions which have been or- ordained in order to secure the peace and happiness of society, are not *• to escape punishment, because they have not ripened into treason. The wisdom of the legislature is competent to provide for the case; and tb o framers of our constitution, who not only defined and limited the crime, hut with jealous circumspection attempted to protect their limitation, by providing that no person should be convicted of it, unless on the testimony of two witnesses to the same overt act, or on confession in open court, must have conceived it more safe, that punishment, in such cases, should be ordained by general laws, formed upon deliberation, under the influence of no resentments, and without knowing on whom they were to operate, than that it should be inflicted under the influence of those passions' which the occasion seldom fails to excite, and which a flexible definition of the crime, or a construction which would render it flexible, might bring into operation. It is, therefore, more safe, as well as more consonant to the principles of our constitution, that the crime of treason should not be extended by construction to doubtful cases ; and that crimes not clearly within the constitutional definition, should receive such punishment as the legislature in its wisdom may provide.
To complete the crime of levying war against the United States, there must be an actual assemblage of men for the purpose of executing a treasonable design. In the case now before the court, a design to overturn the government of the United States, in New Orleans, by force, would have been unquestionably a design which, if carried into execution, would have been treason, and the assemblage of a body of men for the purpose of carrying it into execution, would amount to levying of war against the United States ; but no conspiracy for this object, no enlisting of men to effect it, would be an actual levying of war.
*78 In conformity with the principles now laid down, have been the decisions .. heretofore made by the judges of the United States. *The opinions 1 J given by Judge Paterson and Judge Iredell, in cases before them, imply an actual assembling of men, though they rather designed to remark on the purpose to which the force was to be applied than on the nature of the force itself. Their opinions, however, contemplate the actual employment of force. Judge Chase, in the trial of Fries, was more explicit. He stated the opinion of the court to be, “ that if a body of people conspire and meditate an insurrection to resist or oppose the execution of any statute of the United States, by force, they are only guilty of a high misdemeanor; but if they proceed to carry such intention into execution, by force, that they are guilty of the treason of levying war ; and the quantum of the force employed neither lessens nor increases the crime : whether by one hundred, or one thousand persons, is wholly immaterial.” “ The court are of opinion,” continued Judge Chase, on that occasion, “ that a combination or conspiracy to levy war against the United States is not treason, unless combined with an attempt to carry such combination or conspiracy into execution ; some actual force or violence must be used, in pursuance of such design to levy war ; but it is altogether immaterial, whether the force used is sufficient to1} effectuate the object; any force connected with the intention will constitute the crime of levying war.”
The application of these general principles to the particular case before tin: court, will depend on the testimony which has been exhibited against the accused The first deposition to be considered is that of General Eaton. This gentleman connects in one statement the purport of numerous conversations held with Col. Burr, throughout the last winter. In the course of these conversations, were communicated various criminal projects, which seem to have been revolving in the mind of the projector. An expedition against Mexico seems to have been the first and most matured part of his plan, if , indeed it did not constitute a distinct and separate plan, *upon the J success of which, other schemes, still more culpable, but not yet well digested, might depend. Maps and other information preparatory to its execution, and which would rather indicate that it was the immediate object, had been procured, and for a considerable time, in repeated conversations, the whole efforts of Ool. Burr were directed to prove to the witness, who was to have held a high command under him, the practicability of the enterprise, and in explaining to him the means by which it was to be effected. This deposition exhibits the various schemes of Col. Burr, and its materiality depends on connecting the prisoners at the bar in such of those schemes as were treasonable. For this purpose, the affidavit of General Wilkinson, comprehending in its body the substance of a letter from Col. Burr, has been offered, and was received by the circuit court. To the admission of this testimony, great and serious objections have been made. It has been urged, that it is a voluntary or rather an extra-judicial affidavit, made before a person not appearing to be a magistrate, and contains the substance only of a letter, of which the original is retained by the person who made the affidavit.
The objection that the affidavit is extra-judicial, resolves itself into the question, whether one magistrate may commit on an affidavit taken before another magistrate. For if he may, an affidavit made as the foundation of *79 a commitment, ceases to be extra-judicial, and the person wl o makes it would be as liable to a prosecution for perjury a,s if the warrant of commitment had been issued by the magistrate before whom the affidavit was made. To decide that an affidavit made before one magistrate, would not justify a commitment by another, might in many cases be productive of great inconvenience, and does not appear susceptible of abuse, if the verity of the certificate be established. Such an affidavit seems admissible, on the principle that before the accused is put upon his trial, all the proceedings are ex parts. The court, therefore, overrule this objection.
*That which questions the character of the person who has, on this r#1„n occasion, administered the oath, is next to be considered. The certi- *- ficate from the office of the department of state has been deemed insufficient by the counsel for the prisoners, because the law does not require the appointment of magistrates for the territory of New Orleans to be certified to that office ; because the certificate is in itself informal, and because it does not appear that the magistrates had taken the oath required by the act of congress. The first of these objections is not supported by the law of the case, and the second may be so readily corrected, that the court has proceeded to consider the subject, as if it were corrected, retaining, however, any final decision, if against the prisoner^, until the correction shall be made. With regard to the third, the magistrate must be presumed to have taken the requisite oaths, since he is found acting as a magistrate.
On the admissibility of that part of the affidavit which purports to be as near the substance of the letter from Col. Burr to General Wilkinson, as the latter could interpret it, a division of opinion has taken place in the court. Two judges are of opinion, that as such testimony delivered in the presence of the prisoner on his trial, would be totally inadmissible, neither can it be considered as a foundation for a commitment. Although, in making a commitment, the magistrate does not decide on the guilt of the prisoner, yet he does decide on the probable cause, and a long and painful imprisonment may be the consequence of his decision. This probable cause, therefore, ought to be proved by testimony, in itself, legal, and which, though from the nature of the case it must be ex parte, ought in most other respects, to be such as a court and jury might hear. Two judges are of opinion, that in this incipient stage of the prosecution, an affidavit stating the general purport of a letter may be read, particularly, where the person in possession of it is at too great a distance to admit of *its being obtained, and r¡¡! that a commitment may be founded on it. *-
Under this embarrassment, it was deemed necessary to look into the affidavit, for the purpose of discovering whether, if admitted, it contains matter which would justify the commitment of the prisoners at the bar on the charge of treason. That the letter from Col. Burr to General Wilkinson relates to a military enterprise meditated by the former, has not been questioned. If this enterprise was against Mexico, it would amount to a high misdemeanor ; if against any of the territories of the United States, or if, in its progress, the subversion of the government of the United States, in any of their territories, was a mean, clearly and necessarily, to be employed, if such mean formed a substantive part of the plan, the assemblage of a body of men to effect it, would be levying war against the United States.
The letter is in language which furnishes no distinct view of the design *80 of the writer. The co-operation, however, which is stated to have been secured, points strongly to some expedition against the territories of Spain. After making these general statements, the writer becomes rather more explicit, and says, “ Burr’s plan of operations is to move down rapidly from the falls, on the 15th of November, with the first 500 or 1000 men, in light boats now constructing for that purpose, to be at Natchez, between the 5th and 15th of December, there to meet Wilkinson ; then to determine whether it will be expedient, in the first instance, to seize on, or to pass by, Baton Rouge. The people of the country to which we are going are prepared to receive us. Their agents, now with Burr, say, that if we will protect their religion, and will not subject them to a foreign power, in three weeks, all will be settled.”
There is no expression in these sentences, which would justify a suspicion, that any territory of the United States was the object of the expedition. * 2-| *For what purpose, seize on Baton Rouge ? why engage Spain against ■* this enterprise, if it was designed against the United States ? “ The people of the country to which we are going are prepared to receive us.” This language is peculiarly appropriate to a.foreign country. It will not be contended, that the terms would be inapplicable to a territory of the United States, but other terms would more aptly convey the idea, and Burr seems to consider himself as giving information of which Wilkinson was not possessed. When it is recollected, that he was the governor of a territory adjoining that which must have been threatened, if a territory of the United States was threatened, and that he commanded the army, a part of which was stationed in that territory, the probability that the information communicated related to a foreign country, it must be admitted, gains strength.
“ Their agents, now with Burr, say, that if we will protect their religion, and will not subject them to a foreign power, in three weeks, all will be set-tied.” This is apparently the language of a people who, from the contemplated change in their political situation, feared for their religion, and feared that they would be made the subjects of a foreign power. That the Mexicans should entertain these apprehensions was natural, and would readily be believed. They were, if the representation made of their dispositions be correct, about to place themselves much in the power of men who professed a different faith from theirs, and who, by making them dependent on England or the United States, would subject them to a foreign power. That the people of New Orleans, as a people, if really engaged in the conspiracy, should feel the same apprehensions, and require assurances on the same points, is by no means so obvious.
There certainly is not in the letter delivered to General Wilkinson, so far as the letter is laid before the court, one syllable which has a necessary or a natural reference *to an enterprise against any territory of the J United States. That the bearer of this letter must be considered as acquainted with its contents, is not to be controverted. The letter and his own declarations evince the fact. After stating himself to have passed through New York, and the western states and territories, without insinuating that he had performed on his route any act whatever which was connected with the enterprise, he states their object to be, “to carry an expedition to the Mexican provinces.” This statement may be considered as *81 explanatory of the letter of Col. Bnrr, if the expressions of that letter could be thought ambiguous.
But there are other declarations made by Mr. Swartwout, which constitute the difficulty of this case. On an inquiry from General Wilkinson, he said, “this territory would be revolutionized, where the people were ready to join them, and that there would be some seizing, he supposed, at New Orleans.” If these words import that the government established by the United States in any of its territories, was to be revolutionized by force, although merely as a step to, or a mean of executing some greater projects, the design was unquestionably treasonable, and any assemblage of men for that purpose would amount to a levying of war. But on the import of the words, a difference of opinion exists. Some of the judges suppose, they refer to the territory against which the expedition was intended; others to that in which the conversation was held. Some consider the words, if even applicable to a territory of the United States, as alluding to a revolution to be effected by the people, rather than by the party conducted by Col. Burr.
But whether this treasonable intention be really imputable to the plan or not, it is admitted, that it must have been carried into execution by an open ássemblage of *men for that purpose, previous to the arrest of the r:J. prisoner, in order to consummate the crime as to him ; and a majority *- of the court is of opinion, that the conversation of Mr. Swartwout affords no sufficient proof of such assembling. The prisoner stated, that “ Col. Burr, with the support of a powerful association, extending from New York to New Orleans, was levying an armed body of 7000 men from the state of New York and the western states and territories, with a view to carry an expedition to the Mexican territories.” That the association, whatever may be its purpose, is not treason, has been already stated. That levying an army may or may not be treason, and that this depends on the intention with which it is levied, and on the point to which the parties have advanced, has been also stated. The mere enlisting of men, without assembling them, is not levying war. The question, then, is, whether this evidence proves Col. Burr to have advanced so far in levying an army, as actually to have assembled them.
It is argued, that since it cannot be necessary that the whole 7000 men should have assembled, their commencing their march, by detachments, to the place of rendezvous, must be sufficient to constitute the crime. This position is correct, with some qualification. It cannot be necessary, that the whole army should assemble, and that the various parts which are to compose it should have combined. But it is necessary, that there should be an actual assemblage, and therefore, the evidence should make the fact unequivocal. The travelling of individuals to the place of rendezvous would, perhaps, not be sufficient. This would be an equivocal act, and has no warlike appearance. The meeting of particular bodies of men, and their marching from places of partial to a place of general rendezvous, would be such an assemblage.
The particular words used by Mr. Swartwout are, that Col. Burr “ was levying an armed body of 7000 men.” *If the term levying, in this r*-, 85 place, imports that they were assembled, then such fact would *- amount, if the intention be against the United States, to levying war. If it *82 barely imports that he was enlisting or engaging them in his service, the fact would not amount to levying war. It is thought sufficiently apparent, that the latter is the sense in which the term was used. The fact alluded to, if taken in the proper sense, is of a nature so to force itself upon the public view, that if the army had then actually assembled, either together or in detachments, some evidence of such assembling would have been laid before the court.
The words used by the prisoner, in reference to seizing at New Orleans, and borrowing, perhaps by force, from the bank, though indicating a design to rob, and consequently, importing a high offence, do not designate the specific crime of levying war against the United States.
It is, therefore, the opinion of a majority of the court, that in the case of Samuel Swartwout there is not sufficient evidence of his levying war against the United States to justify his commitment on the charge of treason.
Against Erick Bollman, there is still less testimony. Nothing has been said by him, to support the charge that the enterprise in which he was engaged had any other object than was stated in the letter of Col. Burr. Against him, therefore, there is no evidence to support a charge of treason.
That both of the prisoners were engaged in a most culpable enterprise against the dominions of a power at peace with the United States, those who admit the affidavit of General Wilkinson cannot doubt. But that no part of this crime was committed in the district of Columbia, is apparent. It is, therefore, the unanimous opinion of the court that they cannot be tried in *136] *The law read on the part of the prosecution is under-J stood to apply only to offences committed on the high seas, or in any river, haven, basin or bay, not within the jurisdiction of any particular state. In those cases, there is no court which has particular cognisance of the crime, and therefore, the place in which the criminal shall be apprehended, or, if he be apprehended, where no court has exclusive jurisdiction, that to which he shall be first brought, is substituted for the place in which the offence was committed.
But in this case, a tribunal for the trial of the offence, wherever it may have been committed, had been provided by congress; and at the place where the prisoners were seized by the authority of the commander-in-chief, there existed such a tribunal. It would, too, be extremely dangerous to say, that because the prisoners were apprehended, not by a civil magistrate, but by the military power, there could be given by law a right to try the persons so seized, in any place which the general might select, and to which he might direct them to be carried.
The act of congress which the prisoners are supposed to have violated, describes as offenders those who begin or set on foot, or provide, or prepare, the means for any military expedition or enterprise to be carried on from thence against the dominions of a foreign prince or state with whom the United States are at peace. There is a want of precision in the description of the offence which might produce some difficulty in deciding what cases would come within it.[1]
*83 But several other questions arise, which a court consisting of four judges finds itself unable to decide, and therefore, as the crime with which the prisoners stand charged has not been committed, the court can only directhem to be discharged. This is done, with the less reluctance, because the discharge does not acquit them from the offence which there is probable cause for supposing they have committed, and if those whose duty it is to protect the nation, by prosecuting offenders against the laws, shall suppose *those who have been charged with treason to be proper objects for punishment, they will, when possessed of less exceptionable testimony, and when able to say at what place the offence has been comitted, institute fresh proceedings against them.

 The secretary of state of the United States had certified under the seal of his office, that George Pollock and James Carrick were appointed justices of the peace for the county of Orleans, in the territory of Orleans, in the year 1805, as appears by the official returns of the secretary of the said territory, “ remaining in the office of this department.”

 F. S. Key stated, that he was present at the transaction alluded to. The facts were, that after the court adjourned, and as the judge was going out of the court *72 ■house, a man who had been waiting in the yard, assaulted a lawyer in the presence of the judge, for disrespectful language used by the lawyer in arguing a cause. The judge considered it as a contempt of court, and therefore, directed a bench-warrant to issue.

 The other judges present were Chase, Washington and Johnson. The opinion of Chief Justice Marshall, upon the trial of Col. Burr, in the circuit court at Richmond, in the summer of 1807, elucidates and explains some passages in this •opinion which were supposed to be in some degree doubtful. For that opinion, see Appendix, note B.

 See United States v. Kasinski, 2 Spr. 7; United States v. Hertz, 3 Pitts. L. J. 194; s. c. Whart. Prec. § 1123 n.; United States v. O’Sullivan, Whart. C. L. § 2802 n.; United States v. Lumsden, 1 Bond 5; United States a. Work man, Pamph. Trial.